IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:13-CR-145 |
| v. ) | |
| ) | |
| ) | |
| ) | (VARLAN / GUYTON) |
| LORENZA JACKSON, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on August 28, 2014, for a scheduled pretrial conference and evidentiary hearing on the Defendant's Motion to Suppress Evidence [Doc. 79]. Assistant United States Attorney Caryn L. Hebets appeared on behalf of the Government. Attorney Joseph A. Fanduzz represented the Defendant, who was also present. At the conclusion of the testimony, defense counsel asked to file a post-hearing brief with regard to the suppression motion. The Court granted that request, and the Defendant filed a post-hearing brief [Doc. 90] on September 10, 2014.[1] The Court took the matter under advisement the following day. After reviewing the parties' arguments, the evidence presented at the hearing, and the relevant legal authorities, the Court recommends that the Defendant's motion to suppress be denied.

---

[1] AUSA Hebets stated that the Government's position was fully briefed in its response [Doc. 82], filed on August 5, 2014. She agreed to advise the Court if she decided to file a reply to the Defendant's post-hearing brief.

1

## I. POSITIONS OF THE PARTIES

Defendant Lorenza Jackson is charged [Doc. 7], along with three named codefendants, with conspiracy to distribute heroin from September 1, 2011, to October 16, 2013 (Count One), and with possession of heroin with intent to distribute on September 14, 2013 (Count Two). The Defendant asks [Docs. 79 and 90] the Court to suppress all evidence seized during the September 14, 2014 seizure and frisk of his person because the frisk and seizure of cash concealed in his pocket violated his rights under the Fourth Amendment. He argues that the officer did not have specific and articulable facts that he was armed and dangerous to permit the warrantless <u>Terry</u> frisk of his person. He also contends that the officer improperly seized the cash detected in his pocket during the frisk because the officer could not have immediately recognized it as contraband.

The Government responds [Doc. 82] that the officer had reasonable suspicion that the Defendant was armed and dangerous based upon the totality of the circumstances of the stop, including the information that the Defendant had given the driver drugs to hold. The Government also maintains that the officer properly seized cash from the Defendant's pocket under the plain feel doctrine, because the officer immediately recognized it as contraband during the frisk.

## II. SUMMARY OF THE TESTIMONY

The Government presented the testimony of Knoxville Police Department (KPD) Officer Robert Cook, who testified as follows:

On the morning of September 14, 2013, Officer Cook was on patrol in the area of Interstate 40 (I-40) and Kingston Pike. [Tr.[2] at 4] As he pulled up to a traffic light, he passed a car stopped at the light and saw that the front passenger was not wearing a seatbelt. [Tr. at 4, 16] At the hearing, Officer Cook identified the Defendant as the individual whom he had observed as the passenger. [Tr. at 6] On the day of the stop, Officer Cook noted the license tag number as the car drove past him and ran the tag number on his in-car computer. [Tr. at 4, 16] He learned that the car was registered to Katie Miller. [Tr. at 6] A further records check revealed that Miller had an outstanding arrest warrant. [Tr. at 4, 6] Officer Cook caught up to the car, which by now was on I-40, and initiated a traffic stop. [Tr. at 5, 18] He approached the female driver and asked for identification. [Tr. at 5, 6] She provided a driver's license, which revealed that she was Katie Miller. [Tr. at 6] Officer Cook returned to his car and verified with the KPD records department that there was a valid arrest warrant for Miller. [Tr. at 6] At this point, Officer Cook requested that a second officer report to the scene to insure his safety while making a felony arrest. [Tr. at 10]

Officer Cook returned to the driver's side of the car, told Miller to get out of the car, and directed her to the front of his police car. [Tr. at 7] There, he told Miller that he was arresting her on an outstanding warrant and handcuffed her. [Tr. at 7] He asked Miller if she had anything illegal on her person, to which she replied that the Defendant had stuffed something down her pants. [Tr. at 7, 19] Officer Cook asked what it was, and Miller said it was heroin. [Tr. at 7, 19] Officer Cook did not attempt to retrieve the heroin from Miller but, instead, placed Miller in the back of his cruiser and radioed for a female officer to report to the scene to search Miller. [Tr. at 8, 10-11]

---

[2] The transcript [Doc. 88] of the August 28 suppression hearing was filed on September 2, 2014.

Once Miller was detained in the back of his cruiser, Officer Cook went to the passenger side of Miller's car and asked the Defendant for identification. [Tr. at 8] Officer Cook testified that the Defendant seemed very nervous and told Cook that he did not have his identification with him. [Tr. at 8] The Defendant identified himself as J. Davis. [Tr. at 7, 20] Officer Cook asked for his social security number, which the Defendant fumbled twice in giving. [Tr. at 8] Officer Cook said that the Defendant continued to appear to be looking for his identification, even after stating that he had none. [Tr. at 21] Officer Cook stated that he believed that he had probable cause to arrest the Defendant based upon Miller's statement that he gave her heroin. [Tr. at 8-9] He said that in his experience drugs and guns are commonly found together. [Tr. at 9]

Officer Cook stated that he asked the Defendant to step out of the car as Officer Gerlach arrived on the scene. [Tr. at 11] After the Defendant got out of the car and while Officer Gerlach was standing at the car's rear bumper, Officer Cook patted down the Defendant. [Tr. at 12] Officer Cook felt what he recognized as a substantial amount of cash in the Defendant's pocket but did not remove the cash. [Tr. at 12] He then handcuffed the Defendant and placed him in the back of Officer Gerlach's cruiser. [Tr. at 12-13] He did not tell the Defendant that he was under arrest at that time, but he believed the Defendant to be under arrest for heroin distribution and giving a false name. [Tr. at 13-14] The female officer arrived a few minutes after the Defendant was placed in the cruiser. [Tr. at 14] She searched Miller and found heroin on her person. [Tr. at 14-15]

Officer Cook testified that a K-9 officer arrived on the scene, and his dog alerted on Miller's car, which was then searched. [Tr. at 14-15] After the search of the car, Officer Cook searched the Defendant incident to his arrest and removed $3,063 from the Defendant's

4

pocket. [Tr. at 12, 15] The currency consisted mostly of twenty dollar bills with a few one-hundred dollar bills. [Tr. at 15]

On cross-examination, Officer Cook testified that after first spotting Miller's car, he stopped at the red light with Miller's car behind him in the turn lane. [Tr. at 16] He said that if Miller's car windows were not tinted so dark that the tint blocked his view of the Defendant. [Tr. at 16] When the light turned green, he waited for Miller to pass him so that he could get the license tag number. [Tr. at 17] After he stopped Miller's car on the interstate, the Defendant had his seatbelt buckled. [Tr. at 18] Officer Miller stated that approximately five minutes passed between stopping the car and placing Miller in his cruiser. [Tr. at 20] Officer Cook agreed that he had not confirmed that Miller had heroin on her person when he put her in his police car and stated that he did not ask her how much heroin she had. [Tr. at 20, 26] He acknowledged that he had not observed any unusual behavior from the Defendant up to that point. [Tr. at 20] Officer Cook said that when the Defendant said his name was J. Davis, Officer Cook did not believe him due to his actions. [Tr. at 20] The Defendant was acting nervous and continued to look for identification after telling Officer Cook he did not have any. [Tr. at 21]

Officer Cook stated that when he asked the Defendant to get out of the car, he had already decided to arrest him. [Tr. at 21] Officer Cook said he frisked the Defendant for his own safety. [Tr. at 21-22] The Defendant was wearing loose shorts that hung down to his knees. [Tr. at 23-24] When Officer Cook felt the cash in the Defendant's pocket, he believed it was related to the sale of heroin. [Tr. at 22] Officer Cook agreed that nine minutes and thirty seconds elapsed between him stopping Miller's car and him taking the Defendant into custody. [Tr. at 24] He did not remember whether, when he later removed the cash, it was in three stacks or in separate locations on the Defendant's person. [Tr. at 25]

5

Officer Cook testified that he completed an arrest warrant for the Defendant that day, stating he had arrested the Defendant for the sale of heroin. [Tr. at 22] The warrant did not mention that the Defendant gave a false name. [Tr. at 23] Officer Cook stated that as probable cause for the arrest warrant, he listed that the Defendant was nervous, that Miller had said that he put heroin on her, and that he found cash on the Defendant. [Tr. at 22-23]

### III. FINDINGS OF FACT

The Court makes the following factual findings:

KPS Officer Robert Cook was on patrol on the morning of September 14, 2013, when he observed the Defendant was not wearing a seatbelt while he was a passenger in a car with a female driver. Officer Cook took down the license tag number of the car and ran the tag number on his in-car computer, learning that the car was registered to Katie Miller. A further records check revealed that Miller had an outstanding arrest warrant. Officer Cook caught up with Miller's car on I-40 and conducted a traffic stop. When he approached the driver to ask for identification, he saw that the Defendant was now wearing his seatbelt. Officer Cook obtained the driver's license, which identified her as Katie Miller. He then confirmed with the KPD records department that Miller had an outstanding arrest warrant. At that time, Officer Cook requested that a second officer report to the scene.

Officer Cook asked Miller to get out of her car and to come to the front of his cruiser. He told her that he was arresting her on an outstanding warrant, handcuffed her, and asked whether she had anything illegal on her person. Miller told Officer Cook that the Defendant had stuffed something down her pants. Officer Cook asked what it was, and Miller

told him it was heroin. Officer Cook then placed Miller in the back of his cruiser without searching her person and radioed for a female officer to report to the scene.

With Miller secured in the back of his police car, Officer Miller went to the passenger side of Miller's car to question the Defendant. He asked for identification, but the Defendant, who appeared to be very nervous, said that he did not have identification with him. The Defendant identified himself as J. Davis. Although he purported to have no identification, the Defendant continued to rummage around the front of Miller's car, as if still looking for his identification. The Defendant also twice stumbled over the social security number he gave the officer. Officer Cook, who suspected that the Defendant had given a false name due to the way the Defendant was acting, asked the Defendant to step out of the car. Officer Gerlach arrived and reported to the rear bumper of Miller's car. Officer Cook frisked the Defendant and felt what he believed was a large wad of cash in the pocket of the Defendant's shorts. He did not remove the cash at that time but, instead, handcuffed the Defendant and placed him in the back of Officer Gerlach's cruiser. A few minutes later, a female officer arrived, searched Miller, and found heroin on her person.

A K-9 officer arrived on the scene and swept Miller's car with his drug detection dog. The dog alerted on the car, which was searched. After the search of the car, Officer Cook searched the Defendant incident to his arrest and removed $3,063 in mostly twenty dollar bills from the Defendant's pocket.

## IV. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The Defendant does not challenge the propriety of the stop of

7

Katie Miller's car on September 14, 2013, and the Court finds that Officer Cook had probable cause to stop the car for a traffic violation because he observed the Defendant was not wearing a seatbelt while a passenger in that vehicle. See Tenn. Code Ann. § 55-9-603 (providing that drivers and front seat passengers must wear a seatbelt at all times that the vehicle is moving forward); see also United States v. Street, 614 F.3d 228, 232 (6th Cir. 2010) (holding that officers witnessing a seatbelt violation may properly stop the car). The Court also finds that Officer Cook had probable cause to arrest the driver, Katie Miller, after confirming her identity, because she had an outstanding warrant for her arrest.

The constitutional questions at issue in this case arise after Miller's arrest and once she has been secured in Officer Cook's police car. The Court finds that Officer Cook properly asked the Defendant for identification and to step out of Miller's car. "[A]n officer does not violate the Fourth Amendment during a traffic stop by asking for passenger identification, even where there was no reasonable suspicion of any wrongdoing by the passengers." United States v. Alexander, 467 F. App'x 355, 362 (6th Cir.), cert. denied, 132 S. Ct. 2417 (2012). "In the course of a stop premised on a traffic violation, police may instruct the driver or occupant to exit the vehicle." Id. (citing Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977)). The Defendant challenges what came next, the pat down of his person, arguing that (1) the officer did not have reasonable suspicion to conduct a Terry frisk and (2) the officer improperly seized currency from his pocket because the officer could not immediately identify it as contraband by touch. The Court will examine each of these issues in turn.

8

Case 3:13-cr-00145-TAV-HBG   Document 91   Filed 10/09/14   Page 8 of 18   PageID #: 425

### A. Frisk of the Defendant's Person

Once the Defendant stepped out of Miller's car, Officer Cook had him place his hands on the roof of the car and frisked him. The Defendant argues that the officer lacked reasonable suspicion, based on specific and articulable facts that he was armed and dangerous, to permit a lawful Terry frisk. An officer may frisk a suspect for weapons in order to assure the officer's safety if a reasonable officer under those circumstances would be justified in believing the suspect was "armed and dangerous." Terry v. Ohio, 392 U.S. 1, 27 (1968); United States v. Smith, 594 F.3d 530, 542 (6th Cir. 2010). "[A] frisk for weapons is justified only where specific and articulable facts give a policeman reasonable grounds to believe that an individual is armed and dangerous." United States v. Bell, 762 F.2d 495, 497 (6th Cir. 1985). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. The presence of specific and articulable facts is determined by examining the totality of the circumstances. Bell, 762 F.3d at 499.

The Defendant contends that at the time he was frisked, Officer Cook knew only that the Defendant was nervous and that Miller, a suspected felon, had accused him of placing heroin in her pants. He argues that nervousness itself, even extreme nervousness, is not sufficient to provide reasonable suspicion to frisk him. See United States v. Wilson, 506 F.3d 488, 496 (6th Cir. 2007). He contends that Officer Cook reported that his behavior was otherwise not unusual and points out that Office Cook allowed him to remain seated in the car for a period of time while he spoke with and detained Miller. The Defendant observes that by the time Officer Cook asked him to step out of the car, Officer Gerlach had arrived on the scene, thereby lessening any concern for officer safety. Finally, the Defendant argues that Miller's

9

statement that he gave her drugs was uncorroborated at the time of the frisk and, thus, did not serve to connect him with drug activity such that Officer Cook would believe he was armed due to the officer's experience that drugs and guns often go hand in hand.

The Government responds that Officer Cook had reasonable suspicion that the Defendant could be armed and dangerous based upon information that drugs were in Miller's car. It states that Miller told Officer Cook that she had heroin concealed in her pants. The Government argues that based upon this information from Miller, Officer Cook had a reasonable suspicion that illegal drug activity was afoot and could reasonably infer (based upon his training and experience) that the Defendant was armed and dangerous. The Government maintains that the Defendant's nervousness and failure to produce valid identification served to enhance Officer Cook's suspicion that the Defendant could be armed.

The Court finds that Officer Cook knew the following specific and articulable facts at the time he frisked the Defendant: (1) Miller had accused the Defendant of hiding heroin in her pants, (2) the Defendant seemed unusually nervous as evidenced by his continuing to look for identification after telling Officer Cook he had none, (3) Officer Cook suspected that the Defendant had given a false name based upon the way he was acting in the car, (4) the Defendant stumbled twice in providing his Social Security number, and (5) based upon his law enforcement experience, Officer Cook knew that guns are often associated with drug activity.

The Government appears to be arguing that once an officer suspects a drug crime is afoot, he or she may automatically frisk those associated with the location of the drug trafficking. In support of this argument, it cites to <u>United States v. Vite-Espinoza</u>, 342 F.3d 462 (6th Cir. 2003), in which our appellate court upheld the frisk of two Hispanic men loitering in the back yard of a house at which law enforcement were executing a search warrant to search for

10

marijuana and counterfeit documents. The Government's interpretation of Vite-Espinoza sweeps too far. In Vite-Espinoza, the Court relied heavily on the fact that the officers were at the house to execute a search warrant and were entitled to detain the occupants of the house in order to protect the executing officers, preserve and control the scene, and prevent flight. 342 F.3d at 468 (citing Summers v. Michigan, 452 U.S. 652 (1981)). In Michigan v. Summers, the Supreme Court held that officers executing a search warrant to search for contraband may categorically detain the occupants of the location to be searched because such detention is minimally intrusive and serves to preserve officer safety, "prevent[] flight in the event that incriminating evidence is found," and effectuate the orderly execution of the search warrant. 452 U.S. 692, 703-05 (1981). The Court of Appeals in Vite-Espinoza held that the policies behind Summers and related cases along with two other suspicious circumstances (that the men were Hispanic and that they had no apparent purpose in loitering behind the house) permitted the officers to detain and frisk the defendants. Vite-Espinoza, 342 F.3d at 468. The Court questions the precedential value of Vite-Espinoza outside the context of the execution of a search warrant.

Moreover, our appellate court has expressly rejected the argument that the occupant of a vehicle linked to drug trafficking can be frisked solely because of his or her location in the car: "[A] person's mere presence in a car, which the police believe is connected to drug trafficking, is not an automatic green light for frisking that person." United States v. Noble, 762 F.3d 509, 523 (6th Cir. 2014). "The Supreme Court has made clear that an officer must have specific, articulable reasons to believe that *a particular person* is armed and dangerous before the officer may frisk a suspect." Id. (emphasis added). The appellate court observed that the passenger in Noble took no action that caused the officer to find him threatening and that the officer had "no specific fact that link[ed the passenger] to the drug

11

trafficking operation beyond the [vehicle]." Id. at 524. But, c.f., United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001) (holding that an officer with a reasonable suspicion that a suspect *is carrying* drugs may rely on training and experience to frisk that person).

Nevertheless, information that the passenger is located in a car connected with drug trafficking or a drug trafficker can, along with other information known to the officer, contribute to a reasonable suspicion that the passenger is armed and dangerous. See Bell, 762 F.2d at 502 (finding officer had reasonable suspicion to frisk passenger due in part to driver being known to be armed and dangerous). Here, Officer Cook had information, not only that Defendant was a passenger in a car that had contained heroin (or which had contained a person who had heroin) but also, according to Miller, that the Defendant at one point had control over the heroin and that the Defendant had hidden the heroin on Miller's person. Officer Cook then proceeded to question the Defendant. The Defendant's actions and statements raised further suspicion about the Defendant. First, the Court finds that the video footage reveals that prior to Officer Gerlach's arrival, Officer Cook led the Defendant to believe that he would be permitted to leave the scene in Miller's car. Despite this belief, the Defendant was unusually nervous. Moreover, Officer Cook believed that the Defendant had given a false name based upon the Defendant's nervous actions inside the car and his stumbling over his Social Security number. The Court finds that the totality of these circumstances: Miller's accusation that the Defendant had hidden heroin on her, the Defendant's unusual nervousness, and the Defendant's attempt to mislead Officer Cook about his identity along with Officer Cook's experience about those involved in drug trafficking being armed—provided specific and articulable facts to cause Officer Cook to believe the Defendant was armed and dangerous.

12

The Defendant argues that Miller's statement that the Defendant hid heroin on her person cannot contribute to Officer Cook's reasonable suspicion because Miller had just been arrested on a preexisting arrest warrant for a felony[3] and her statement about the Defendant was uncorroborated. In Noble, our appellate court held that an officer cannot rely solely upon his or her training and experience that persons involved in drug trafficking are generally armed in order to conduct a Terry pat down during a traffic stop. 762 F.3d at 524. Instead, the court observed that it had "always required some corroboration that particular individuals are involved in dealing drugs before allowing a frisk for weapons." Id. The Court finds that the corroboration that the court required in Noble was corroboration that a particular person is involved in drug trafficking before the officer may rely upon his or her experience that drug traffickers are frequently armed. In this case, Miller's statement about the Defendant hiding heroin in her pants is information that shows his involvement beyond his mere presence in a car in which drugs were located.

The Defendant also faults Officer Cook for failing to confirm that Miller had heroin on her person before frisking him. However, the Court notes that frisking Miller would have confirmed only the existence of the heroin, not from whence it came. Miller made a statement against her own interest in admitting that she had heroin in her pants. Accordingly, the Court finds that Miller's statement could contribute to Officer Cook's suspicions about the Defendant's dangerousness, although he had no information about her reliability.

In United States v. Bearden, the court relied upon the uncorroborated statement of a confederate that persons working at a tire business were armed to contribute to an officer's

---

[3] Although the Defendant argues in his brief that Miller's arrest warrant was for theft, Officer Cook did not testify about the crime giving rise to the arrest warrant, nor did the parties produce a copy of the arrest warrant at the suppression hearing. The Court notes that although the audio on the DVD from Officer Cook's in-car camera is poor, during the stop, Officer Cook tells Miller that she has been arrested on an outstanding warrant for theft.

reasonable suspicion to frisk. 213 F. App'x 410, 412 (6th Cir. 2007). The owner of the tire business was arrested for drug trafficking and consented to a search of the premises. Id. at 411. The officers searching the business knew a confidential informant had recorded the owner saying that his employees were armed. Id. The officers saw Bearden, a customer, standing in the work bay and, mistaking him for an employee, they frisked him. Id. "Because it was reasonable for law enforcement officers to believe that employees were armed based on the information provided by the owner of North Tire and because it was reasonable for the officers to assume Bearden was an employee, the pat down search revealing the weapon was reasonable." Id. at 415.[4] Likewise, the Court finds that Miller's statement that the heroin was from the Defendant could contribute to Officer Cook's reasonable suspicion to frisk the Defendant.

Finally, even if the frisk of the Defendant violated the Fourth Amendment, Officer Cook did not seize any items from the Defendant's person as a result of the frisk. The currency in question was seized in a subsequent search of the Defendant incident to his arrest, following a drug detection dog's alert on the car. Accordingly, as discussed fully below, the Court finds that Officer Cook would have inevitably discovered and seized the currency, even if the frisk of the Defendant was improper.

### B. Seizure of Currency from Defendant's Pocket

The Defendant also argues that Officer Cook improperly seized the currency from his pocket because the currency was not immediately recognizable as contraband or an instrument of assault during the frisk. The Government responds that after learning from Miller

---

[4] The Court of Appeals also found that Bearden was properly detained pursuant to the reasoning in Summers regarding securing persons on a premises to be searched pursuant to a search warrant. However, the Court applied the Terry reasonable suspicion standard to the frisk of Bearden.

14

that the Defendant had concealed heroin on her person, Officer Cook immediately recognized that the large amount of cash in the Defendant's pocket was contraband. Alternatively, the Government argues that law enforcement would have inevitably discovered and seized the currency when they subsequently searched the Defendant incident to his arrest. The Defendant contests the inevitable discovery of the currency, arguing that because Officer Cook could not legitimately recognize the currency as contraband, Officer Cook had no basis to connect him with the drugs on Miller and the paraphernalia in Miller's car in order to arrest him. He contends that if Officer Cook lacked probable cause to arrest him, then any fruits of the search of his person incident to his arrest must be suppressed.

An officer conducting a Terry pat down may seize items that he discovers through the sense of touch if the shape or weight of the object causes its incriminating nature to be immediately apparent to the officer. Minnesota v. Dickerson, 508 U.S. 366, 376 (1993) (extending the plain view doctrine to items discovered through touch). In determining whether the incriminating nature of the item is "immediately apparent," the Court examines three factors:

> "(1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature."

United States v. Chandler, 437 F. App'x 420, 427 (6th Cir. 2011) (quoting United States v. Garcia, 496 F.3d 495, 510 (6th Cir. 2007) (applying these factors in the context of the plain view exception to the warrant requirement). The absence of any of these factors is not fatal to a finding of plain touch. Id.

In the present case, the Court finds that upon frisking the Defendant, who was wearing loose shorts, Officer Cook felt what he recognized from the feel of the object to be a large amount of cash. The Defendant argues that Officer Cook had no way to know whether the currency in his pocket was fifty one-dollar bills, which would be consistent with spending money, or a large number of larger bills. Moreover, the Defendant contends that without confirming that Miller actually had heroin on her person, Officer Cook had no basis to believe at the time of the frisk that the cash in his pocket was from drug sales.

Officer Cook's testimony at the suppression hearing dispels the Defendant's arguments. First, Officer Cook testified that when he frisked the Defendant, "[i]t was clear that he had a substantial amount of cash in his pocket." [Tr. at 12] On cross-examination, he agreed that "when he grabbed on the wad of cash[, he] knew it was cash" by the way it felt. [Tr. at 22] The officer stated that when the cash was later seized and counted, the amount was $3,063 in denominations of a few one hundred dollar bills and mostly twenty dollar bills. [Tr. at 15] Even if the Defendant had ten one hundred dollar bills, the remaining $2,063 in twenty dollar bills would have the defendant possessing a stack of 116 bills (10 hundreds, 103 twenties, and three ones), a stack that would be twice as thick as fifty one dollar bills. Although possession of a large amount of currency is not automatically incriminating, Miller's statement provides a nexus between the large stack of cash and suspected criminal activity. Additionally, "no additional investigation was needed to establish the likely connection between the currency and the suspected narcotics transaction." Chandler, 437 F. App'x at 428 (holding the incriminating nature of a large amount of currency was immediately apparent when police had reasonable suspicion that defendant had recently participated in illegal drug transaction). Accordingly, the

Court finds that Officer Cook *could have* properly seized the currency in the Defendant's pocket pursuant to the plain touch doctrine. However, Officer Cook did not seize the cash at that time.

Officer Cook seized the cash from the Defendant following a drug detection dog's alert on the car. Based upon the drug dog's alert, Officer Cook had probable cause to believe that the car contained illegal drugs. United States v. Navarro-Camacho, 186 F.3d 701, 706 (6th Cir. 1998) (holding that a "positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance"). The Defendant contends that Officer Cook had no basis to suspect any drugs in the car were his because the car belonged to Miller and the heroin was found on Miller's person. However, Miller had already implicated the Defendant in the heroin on her person, and as a passenger in Miller's car, the Defendant had access to the contraband[5] contained therein. See Maryland v. Pringle, 540 U.S. 366, 372 (2003) (holding in the absence of any of the car's occupants providing information as to the ownership of cocaine, that officer had probable cause to arrest defendant who was passenger in car containing $763 in glove compartment and cocaine behind the back-seat armrest that was "accessible" to all three occupants). Thus, the Court finds that Officer Cook had probable cause to arrest the Defendant, even without considering the large amount of currency in his pocket.

Officer Cook validly seized the currency from the Defendant in a search of his person incident to his arrest. See United States v. Robinson, 414 U.S. 218, 235 (1973) (holding that an arresting officer may lawfully conduct a full search of the arrestee's person incident to a

---

[5] Officer Cook did not testify about any contraband seized from the car. The Government's brief states that "[b]ehind the passenger seat, officers located a Food City bag containing between 300 and 400 empty gel caps and a set of digital scales." [Doc. 82, p.2] The Defendant's supplemental brief states that "the scales and gel-caps were in [Miller's] car." [Doc. 90, p. 9] Although this evidence is not before the Court, if it were, the Court finds that it would give further support to the Court's finding that Officer Cook had probable cause to arrest the Defendant for drug trafficking, because the paraphernalia was located behind the passenger's seat and accessible to the Defendant as well as Miller.

17

lawful arrest). Thus, the Court finds that the currency found on the Defendant's person in his shorts pocket would have been inevitably discovered in a search incident to his arrest for drug trafficking. See Nix v. Williams, 467 U.S. 431, 444-46 (1984) (declining to apply the exclusionary rule to evidence that would have been inevitably and lawfully gained had the government misconduct not occurred).

## V. CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds no basis to suppress the evidence resulting from the frisk of the Defendant. For the reasons set forth herein, the Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence [Doc. 79] be **DENIED**.[6]

Respectfully submitted,

*[signature: Bruce Guyton]*
United States Magistrate Judge

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).